No. 16-2023

*In the*

# United States Court of Appeals

*for the*

# First Circuit

————————————————

RACHEL CULLINANE, JACQUELINE NUNEZ, ELIZABETH SCHAUL, and ROSS MCDONOUGH, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

UBER TECHNOLOGIES, INC.,

*Defendant-Appellee.*

————————————————

On appeal from a final judgment of the
United States District Court for the District of Massachusetts
Case No. 1:14-cv-14750

————————————————

## BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANT-APPELLEE AND FOR AFFIRMANCE

————————————————

Kate Comerford Todd
Warren Postman
U.S. CHAMBER LITIGATION
   CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

Andrew J. Pincus
Archis A. Parasharami
Daniel E. Jones
Karianne M. Jones*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000

*Attorneys for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF THE *AMICUS CURIAE* ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 2

ARGUMENT ................................................................................................... 5

I.  Appellants Seek An Unwarranted Departure From Recognized Principles Of Contract Formation. .................................. 5

    A.  The mobile sign-up process at issue creates an enforceable online contract. ...................................................... 5

    B.  Appellants' arguments cannot be squared with ordinary contract formation principles ................................... 9

II.  Appellants' Demand For Heightened Standards For Enforcement Of Arbitration Agreements Runs Headlong Into The FAA ................................................................................. 16

CONCLUSION ............................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*14 Penn Plaza LLC v. Pyett,*
    556 U.S. 247 (2009) ................................................................ 18

*Adelson v. Harris,*
    973 F. Supp. 2d 467 (S.D.N.Y. 2013) ...................................... 6

*Ajemian v. Yahoo!, Inc.,*
    987 N.E.2d 604 (Mass. Ct. App. 2013) ............................. 5, 11

*Allied-Bruce Terminix Cos. v. Dobson,*
    513 U.S. 265 (1995) ................................................................ 17

*Arthur Andersen LLP v. Carlisle,*
    556 U.S. 624 (2009) ................................................................ 17

*AT&T Mobility LLC v. Concepcion,*
    563 U.S. 333 (2011) ................................................. 4, 16, 17, 18

*Berkson v. Gogo LLC,*
    97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................ 12, 13, 14

*Binder v. Aetna Life Ins. Co.,*
    75 Cal. App. 4th 832 (1999) ..................................................... 5

*Buckeye Check Cashing, Inc. v. Cardegna,*
    546 U.S. 440 (2006) ................................................................ 17

*Carbajal v. H&R Block Tax Servs., Inc.,*
    372 F.3d 903 (7th Cir. 2004) ................................................... 18

*Carnival Cruise Lines, Inc. v. Shute,*
    499 U.S. 585 (1991) .................................................................. 6

*Cordas v. Uber Techs., Inc.,*
    2017 WL 658847 (N.D. Cal. Jan. 5, 2017) ............................. 11

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Crawford v. Beachbody, LLC,*
2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) .............................. 9, 12, 14

*Cubria v. Uber Techs., Inc.,*
2017 WL 1034371 (W.D. Tex. Mar. 16, 2017) .................................... 11

*DIRECTV, Inc. v. Imburgia,*
136 S. Ct. 463 (2015).................................................................... 4, 17

*Doctor's Assocs., Inc. v. Casarotto,*
517 U.S. 681 (1996)......................................................... 4, 17, 19, 20

*EEOC v. Waffle House, Inc.,*
534 U.S. 279 (2002)............................................................................ 16

*In re Facebook Biometric Information Privacy Litig.,*
2016 WL 2593853 (N.D. Cal. May 5, 2016)......................................... 8

*Fteja v. Facebook, Inc.,*
841 F. Supp. 2d 829 (S.D.N.Y. 2012)...................................... *passim*

*Gilmer v. Interstate/Johnson Lane Corp.,*
500 U.S. 20 (1991)................................................................................ 18

*Hancock v. Am. Tel. & Tel. Co.,*
701 F.3d 1248 (10th Cir. 2012) ........................................................... 9

*Harrington v. Atl. Sounding Co.,*
602 F.3d 113 (2d Cir. 2010) ............................................................... 18

*Marmet Health Care Ctr., Inc. v. Brown,*
132 S. Ct. 1201 (2012) (per curiam).................................................... 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
473 U.S. 614 (1985)............................................................................. 18

*Nguyen v. Barnes & Noble, Inc.,*
763 F.3d 1171 (9th Cir. 2014)........................................... 8, 12, 13, 14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Perry v. Thomas,*
    482 U.S. 483 (1987)...................................................................... 4, 17

*Preston v. Ferrer,*
    552 U.S. 346 (2008)........................................................................... 17

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ......................................................... 5, 13

*Rent-A-Center, West, Inc. v. Jackson,*
    561 U.S. 63 (2010)............................................................................ 17

*Robert Lawrence Co. v. Devonshire Fabrics, Inc.,*
    271 F.2d 402 (2d Cir. 1959) .............................................................. 16

*Salameno v. Gogo, Inc.,*
    2016 WL 4005783 (E.D.N.Y. July 25, 2016)............................... 13, 14

*Scherk v. Alberto-Culver Co.,*
    417 U.S. 506 (1974)........................................................................... 17

*Schwartz v. Comcast,*
    256 F. App'x 515 (3d Cir. 2007) ...................................................... 10

*Shearson/Am. Express, Inc. v. McMahon,*
    482 U.S. 220 (1987)........................................................................... 18

*Southland Corp. v. Keating,*
    465 U.S. 1 (1984).............................................................................. 17

*Specht v. Netscape Commc'ns Corp.,*
    306 F.3d 17 (2d Cir. 2002) ........................................................... 5, 13

*Starke v. Gilt Groupe, Inc.,*
    2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014)................................. 8, 12

*Swift v. Zynga Game Network, Inc.,*
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ...................................... 8, 12, 14

iv

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Tompkins v. 23andMe, Inc.*,
  2014 WL 2903752 (N.D. Cal. June 25, 2014), *aff'd*, 840
  F.3d 1016 (9th Cir. 2016) .................................................................. 12

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010) ......................................................... 14

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr.
  Univ.*,
  489 U.S. 468 (1989) ............................................................................ 17

*Zaltz v. JDATE*,
  952 F. Supp. 2d 439 (E.D.N.Y. 2013) ......................................... 7, 12

## STATUTES, RULES AND REGULATIONS

9 U.S.C. § 2 .................................................................................. 17, 19

Fed. R. App. P. 29(c)(5) ................................................................... 1

## MISCELLANEOUS

Apple ID Support, Apple, https://support.apple.com/apple-id ............... 15

*Looking Forward: Keeping Up With Consumers in 2015 and
  Beyond*, Webgains, http://www.webgains.com/public/
  looking-forward-keeping-up-with-consumers-in-2015-and-
  beyond/ ................................................................................................ 14

Jennifer Maloney, *The Rise of Phone Reading*, Wall St. J.,
  Aug. 14, 2015, http://www.wsj.com/articles/the-rise-of-
  phone-reading-1439398395 ............................................................ 10

U.S. Dep't of Commerce, *E-Stats 2014: Measuring the Elec-
  tronic Economy* 2, http://www.census.gov/content/dam/
  Census/library/publications/2016/econ/e14-estats.pdf
  (June 8, 2016) ................................................................................ 2, 3

# INTEREST OF THE *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.

One of the Chamber's most important responsibilities is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of vital concern to the nation's business community.

Many of the Chamber's members and affiliates conduct substantial business online. Indeed, hundreds of billions of dollars' worth of e-commerce transactions are conducted every year in the United States. The enforceability of online contracts is thus of critical importance to the Chamber and its members, as well as the Nation's economy more generally.

---

[1]     Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *amicus* affirms that no party or counsel for a party authored this brief in whole or in part and that no person other than *amicus*, its members, or its counsel has made any monetary contributions intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

Moreover, many of the Chamber's members and affiliates regularly employ arbitration agreements in their online contracts. Arbitration allows them to resolve disputes promptly and efficiently while avoiding the costs associated with traditional litigation. Arbitration is speedy, fair, inexpensive, and less adversarial than litigation in court. Based on the legislative policy reflected in the Federal Arbitration Act ("FAA") and the United States Supreme Court's consistent affirmation of the legal protection the FAA provides for arbitration agreements, the Chamber's members have structured millions of contractual relationships—including enormous numbers of online contracts—around arbitration agreements. Appellants would have this Court subject online contracts that include arbitration provisions to a heightened test for enforceability, which would create an unacceptable cloud of uncertainty over those agreements.

The Chamber therefore has a strong interest in this Court's resolution of the appeal.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2014, the U.S. economy included an estimated $510 billion in e-commerce transactions in the service industry alone, growing six percent faster year-to-year than the overall service industry. *See* U.S. Dep't of Commerce, *E-Stats 2014: Measuring the Electronic Economy* 2, http://www.census.gov/content/dam/Census/library/publications/2016/

econ/e14-estats.pdf (June 8, 2016). And e-commerce transactions in the retail industry added over $298 billion to the economy, growing nearly eight percent faster than the overall retail industry. *Id.* Increasingly, with the advent of smartphones and tablets, these transactions are taking place on mobile devices rather than desktop computers. The enormous, and rapidly expanding, e-commerce sector of the economy relies more and more on online contracts such as those that the district court enforced here.

The district court's order accords with settled principles of contract law applied to determine whether parties have entered into enforceable contracts online. Courts have regularly held that the method of contractual formation at issue here—in which Uber's sign-up process required plaintiff and any other potential Uber rider to click a "DONE" button that was accompanied by both (1) a clear statement that pressing the button constituted assent to Uber's terms of service and (2) a hyperlink to the terms themselves—satisfies traditional standards for contract formation.

Recognizing these well-settled legal principles, and real-world practice, the court below concluded that an enforceable contract had been formed: "[t]he process through which the plaintiffs established their accounts put them on reasonable notice that their affirmative act of signing up also bound them to Uber's Agreement." Specifically, the district court found that the notice on Uber's registration screen was "prominent enough

to put a reasonable user on notice of the terms of the Agreement" and that "[t]he language surrounding the button leading to the Agreement is unambiguous in alerting the user that creating an account will bind her to the Agreement."

The district court's approach was correct, and appellants' attempt to flyspeck the design of Uber's registration screen is inconsistent with well-established standards of contract formation, both online and off. Accepting appellants' arguments would create considerable uncertainty over the formation and enforceability of online contracts, imposing massive and unwarranted costs on businesses that enter into transactions in the mobile economy.

Moreover, appellants' argument for the adoption of a heightened notice requirement for the formation of contracts containing arbitration clauses should be rejected. Such a standard would run afoul of well-established Supreme Court precedent holding that the Federal Arbitration Act forbids courts from "singling out arbitration provisions for suspect status" under the guise of state-law contract rules. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *see also DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468-69 (2015); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987).

## ARGUMENT

## I. APPELLANTS SEEK AN UNWARRANTED DEPARTURE FROM RECOGNIZED PRINCIPLES OF ONLINE CONTRACT FORMATION.

### A. The mobile sign-up process at issue creates an enforce-able online contract.

As courts have long recognized, and as appellants acknowledge in their brief (at 26), "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). Both online and off, mutual assent is the "touchstone of contract." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (Sotomayor, J.) (citing *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999)).[2] In both contexts, the question is whether there has been both notice and acceptance. In other words, the relevant inquiry under Massachusetts law is whether Uber's terms and conditions "were reasonably communicated and accepted." *Ajemian*, 987 N.E.2d at 573.

The district court correctly concluded that the sign-up process used by Uber complied with these well-established principles of contract formation. The use of a clear hyperlink to a company's full terms of service

---

[2]     The Second Circuit was applying California law in *Specht*. The principles of contract formation are the same under Massachusetts law. *See, e.g.*, *Ajemian v. Yahoo!, Inc.*, 987 N.E.2d 604, 613 (Mass. Ct. App. 2013).

along with an acknowledgment that completing the sign-up process constitutes assent to those terms is simply the twenty-first century equivalent of the practice, held enforceable in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), of placing terms on the back side of a cruise ship ticket.

In reaching this conclusion, the district court correctly relied on the reasoning in *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012). Judge Holwell offered the following instructive analogy. Imagine that a customer takes an apple from a roadside bin with a sign that reads: "By picking up this apple, you consent to the terms of sales by this fruit stand. For those terms, turn over this sign." *Id.* at 839. Nobody would dispute that such terms bind the customer whether or not he or she chooses to review them. *Id.* at 839-40 (citing *Carnival Cruise Lines*, 499 U.S. at 587).

That principle applies equally in cases like this one where a company uses a hyperlink to its terms and conditions. Indeed, in 2017, the existence and function of a hyperlink cannot be considered a plausible source of mystery or confusion. As one judge put it a few years ago: "Not so long ago, the Second Circuit could not discuss the hyperlink without defining the innovation for its readers. . . . Nearly two decades later, it is simply assumed that persons navigating the Internet understand hyperlinks as means of connecting one webpage to another." *Adelson v. Harris*, 973 F. Supp. 2d 467, 483 (S.D.N.Y. 2013); *see also Fteja*, 841 F. Supp. 2d at 839.

6

Indeed, given the increasing ubiquity of smartphones and other mobile de-vices, using hyperlinks to navigate to related pages on the Internet is an everyday occurrence.

Similarly, virtually every purchase of goods or services online carries with it a set of terms and conditions. Accordingly, it is implausible to as-sume that a user who signs up to purchase goods or services on the Inter-net would not know that (i) the transaction is governed by terms and con-ditions, and (ii) those terms are available via a link to a different screen.

Given these commonsense understandings of how the Internet works, it is unsurprising that courts have repeatedly held that the combi-nation of hyperlinked terms and an acknowledgment that clicking or pressing a button accepts those terms establishes mutual assent. *See* Uber Br. 19-21 & n.25 (collecting cases). In *Fteja*, for example, the court held that a similar sign-up process formed a valid contract because the plaintiff "was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequenc-es. That was enough." 841 F. Supp. 2d at 840.

Similarly, another court enforced a defendant's terms of service be-cause "defendant's reference to its Terms and Conditions of Service appear on the same screen as the button a prospective user must click in order to move forward in the registration process." *Zaltz v. JDATE*, 952 F. Supp.

7

2d 439, 452-54 (E.D.N.Y. 2013). And in *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014), Judge Stanton enforced a similar-looking registration screen because it "directed [the plaintiff] exactly where to click in order to review th[e] terms" and explained that "[b]y joining Gilt through email" the plaintiff assented to those terms when he entered his email address and clicked the "Shop Now!" button. *Id.* at *1, *3; *see also* Uber Opening Br. 21 (reproducing Gilt's registration screen).

Other courts are in accord. For instance, following the reasoning of *Fteja*—and the Ninth Circuit's endorsement of that reasoning in *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014)—a federal district court in California recently held that an on-line contract had been validly formed, because the "user . . . had to take some action" to indicate assent and proceed with the use of the site, rather than having assent "foisted upon him simply by passively viewing a website." *In re Facebook Biometric Information Privacy Litig.*, 2016 WL 2593853, at *8 (N.D. Cal. May 5, 2016). Another court held that a user assented to the contract, and its arbitration provision, by clicking on a button located above text that stated that "[b]y proceeding" the user was agreeing to the company's hyperlinked terms of service. *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 911-12 (N.D. Cal. 2011). And in still another case, the court held that the user assented to the agreement by clicking a "PLACE ORDER" button

near a hyperlink to the full terms and an acknowledgement that by clicking the button the user "ha[s] read and understand[s] the" terms. *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *1 (S.D. Cal. Nov. 5, 2014).

In short, as the Tenth Circuit has put it, online agreements of the sort formed here "are increasingly common and have routinely been upheld." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012) (quotation marks and citation omitted). As we next discuss, appellants offer no persuasive reason to reach a different result here.

### B. Appellants' arguments cannot be squared with ordinary contract formation principles.

Although the appellants pay lip service to the contract-formation standards just discussed, they ask this Court to depart from them in numerous respects.

*First*, appellants complain that notice was inadequate because the phrase "[b]y creating an Uber account, you agree to The Terms of Service & Privacy Policy" was included on a screen titled "Link Card" (referring to the user's credit card). Op. Br. 34. But appellants' myopic focus on the title of the screen ignores the larger context: they were providing Uber with personal information and granting the company the ability to charge payments to their credit cards in connection with accessing Uber's services. Certainly "it is impossible to infer that a reasonable adult in [appellants']

9

position would believe that" Uber was offering to provide recurring access to its services without any kind of contract. *Schwartz v. Comcast*, 256 F. App'x 515, 519-20 (3d Cir. 2007) (customer was bound by contract terms for Internet service available on provider's website). As the Third Circuit observed, such an argument is "nonsensical." *Id.*

*Second*, appellants' criticism of the layout and the font size of the "Terms of Service" acknowledgment and hyperlink on Uber's registration screen fails to account for how the registration screen was actually presented to them on their mobile devices. Appellants have presented no record evidence about the size or model of the iPhones that they allegedly used to view and complete the registration screen. In fact, as Uber's brief points out (at 27), appellants presented screenshots of their supposed screens in a 3.5-inch format, but presented all other screenshots in a 4.7 or 5-inch format.

More generally, appellants fail to contend with the fact that Americans have grown accustomed to using their mobile devices to read documents. *See* Jennifer Maloney, *The Rise of Phone Reading*, Wall St. J., Aug. 14, 2015, http://www.wsj.com/articles/the-rise-of-phone-reading-1439398395. Indeed, "[o]n Twitter, people have celebrated major feats of reading, accomplished entirely on smartphones, including 'Moby-Dick,' 'War and Peace,' and 'Swann's Way.'" *Id.*

*Third*, and relatedly, appellants incorrectly insist that Uber was required to make the notice "clear and conspicuous." But that heightened standard is not the law in Massachusetts. Instead, as Uber's brief makes clear, Massachusetts applies the "'modern rule of reasonableness'" and therefore "requires only that a reasonably prudent person would be on notice of the terms." Uber Br. 22-23 (quoting *Ajemian*, 987 N.E.2d at 611-12 & n.12).

That standard is readily satisfied here: the notice of the terms and conditions was immediately viewable; in the center of the screen; bolded; in a contrasting color; and written in larger font than other text on the screen. The notice was further visually emphasized with a box around it. The screen itself was not cluttered. It contained a total of 26 words (the notice itself comprises 16 of those words) and a single hyperlink to the Terms and Conditions. As Uber points out, other district courts besides the court below have found that the same visual presentation by Uber provides adequate notice for contract formation. Uber Br. 24-25 (citing *Cubria v. Uber Techs., Inc.*, 2017 WL 1034371, at *5 (W.D. Tex. Mar. 16, 2017); *Cordas v. Uber Techs., Inc.*, 2017 WL 658847, at *4 (N.D. Cal. Jan. 5, 2017)).

*Fourth*, relying on Judge Weinstein's opinion in *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015), and his novel nomenclature of

"sign-in wrap," appellants fault Uber for not including a separate check "box stating 'I agree'" on the registration screen. Op. Br. 20.[3]

Generally applicable contract law does not mandate the use of a check box. Instead, it is more than enough to satisfy the reasonable-notice and manifestation-of-assent requirements to provide a hyperlink to a company's full Terms plus the click-to-accept acknowledgment. For instance, the sign-up screens used to create a contractual relationship between the business and the user in *Fteja*, *Starke*, *Crawford*, and *Swift*—all discussed above (*see* pages 6-9)—did not include a blank check box. And in other cases in which sign-up screens did include blank boxes—such as *Zaltz* or *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *3 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016)—the decisions did not suggest that the outcome would have been any different without the check box. The Ninth Circuit in *Nguyen*, for example, treated *Fteja* and *Zaltz* equally—citing both with approval in explaining the enforceability of a click-to-accept acknowledgment plus hyperlink. *See Nguyen*, 763 F.3d at 1176-77.

---

[3]    The order in *Berkson* was appealed to the Second Circuit, and the Chamber submitted an *amicus* brief detailing the substantial flaws in Judge Weinstein's approach. *See* Dkt. No. 85, No. 15-1407 (2d Cir. Aug. 7, 2015). The parties subsequently settled the case, however, and withdrew the appeal before the Second Circuit had the opportunity to rule.

Indeed, *Berkson* is the only decision relied on by the appellants that adopts the "sign-in wrap" distinction between the use of a button and the use of a button plus a check box. But *Berkson* rested on the premise that the standards for forming contracts online should be more restrictive than in the paper world—a premise that in turn was based on Judge Weinstein's erroneous views of online commerce. Judge Weinstein stated: "It is not unreasonable to assume that there is a difference between paper and electronic contracting. Based on assumptions about internet consumers, they require clearer notice than do traditional retail buyers." *Berkson*, 97 F. Supp. 3d at 382. Yet that premise is irreconcilable with the Second Circuit's repeated pronouncements—to which Judge Weinstein was bound— that there are no separate rules of the road for online contract formation. *See, e.g.*, *Register.com*, 763 F.3d at 1175; *Specht*, 306 F.3d at 29.[4]

---

[4]     In a subsequent case involving Gogo's terms, Judge Weinstein appeared to reconsider some of his assumptions in *Berkson*. He acknowledged that the parties in *Berkson* had subsequently "submitted convincing evidence that plaintiffs, and others who used Gogo's product, were generally sophisticated business persons, rather than average individuals." *Salameno v. Gogo, Inc.*, 2016 WL 4005783, at *5 (E.D.N.Y. July 25, 2016) (quotation marks omitted). More important, in enforcing Gogo's terms in *Salameno*, Judge Weinstein remarked that "[i]n today's technologically driven society, it is reasonable to charge experienced users—as plaintiffs appear to be—with knowledge of how hyperlinks work and, by extension, how to access the terms of use." *Id.* at *6; *see also Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1178 (9th Cir. 2010) ("Consumers who use the internet for shopping are generally quite sophisticated about

Moreover, *Berkson* expressly disagreed with *every other case on the subject*. Judge Weinstein acknowledged that the "sign-in wrap" at issue in that case "most closely resemble[d] the online contract discussed in *Fteja*," but asserted that "*Fteja*, and lower court cases that follow its lead"—including California cases such as *Crawford* and *Swift*, and by extension the Ninth Circuit's decision in *Nguyen*—were wrongly decided. 97 F. Supp. 3d at 403. The district court here was right to reject this novel and unsupported view of contract formation.

*Finally*, appellants surmise, without any legal or factual support, that a reasonable user would not be able to make the connection between clicking a button saying "DONE" and an acknowledgment that "[b]y creating an Uber account, you agree to the Terms of Service & Privacy Policy." Op. Br. 40.

Not so. As Uber demonstrates in its brief (at 32 & n.43), assent is not subject to appellants' magic-words test. Instead, courts consider a va-

---

such matters"). The same surely can be said of individuals who are entering into transactions via mobile devices. *See, e.g.*, *Looking Forward: Keeping Up With Consumers in 2015 and Beyond*, Webgains, http://www.webgains.com/public/looking-forward-keeping-up-with-consumers-in-2015-and-beyond/ (last visited Apr. 18, 2017) ("The modern consumer is one who is vocal online, sophisticated in their needs and confident in their use of personal technology").

riety of phrases to be equivalent to "I agree" in the context of an e-commerce transaction. *See id.* (collecting cases).

And, as discussed above, it would make no sense to assume that a user does not realize that an e-commerce transaction involves terms and conditions after (1) submitting personal information to create an account, (2) authorizing access to a credit card to pay for recurrent services, (3) viewing a conspicuous statement in the registration process that "By creating an Uber account, you agree to The Terms of Service & Privacy Policy," and (4) clicking "DONE" to complete the registration process.

That is especially true for consumers who are knowledgeable enough about the Internet and mobile devices to sign up for and use Uber's services through its mobile application. Such riders must, at minimum (1) have a smartphone; (2) have registered for an account to use Apple's or Google's application store (for iPhone or Android users);[5] (3) know how to search for and download Uber's application; (4) know how to and be willing to enter their credit card information online to complete the registration process—a sure sign that a transaction is in progress; and (5) anticipate

---

[5]    *See* Apple ID Support, Apple, https://support.apple.com/apple-id (last visited Apr. 18, 2017) ("Your Apple ID is the account you use to access Apple Services like the App Store, Apple Music, iCloud, iMessage, FaceTime, and more."); Google Play - Apps, Google, https://play.google.com/store/apps?hl=en (last visited Apr. 18, 2017) (requiring users to "Sign In" to download applications).

using Uber's application to obtain ride-sharing services. Thus, if there were any particular inference about Uber's customers that this Court should draw, it is that they are, relatively speaking, technologically sophisticated.[6]

## II. APPELLANTS' DEMAND FOR HEIGHTENED STANDARDS FOR ENFORCEMENT OF ARBITRATION AGREEMENTS RUNS HEADLONG INTO THE FAA.

As the United States Supreme Court has observed, "the judicial hostility towards arbitration that prompted the FAA had manifested itself in 'a great variety' of 'devices and formulas.'" *Concepcion*, 563 U.S. at 342 (quoting *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 406 (2d Cir. 1959)). Congress enacted the FAA to "reverse the longstanding judicial hostility to arbitration agreements," "to place [these] agreements upon the same footing as other contracts," and to "manifest a liberal federal policy favoring arbitration agreements." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quotation marks omitted).

At the heart of the FAA is Section 2, which "embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate . . . is revocable 'upon such grounds as exist at law or in equity for the revocation of

---

[6]     For all of the above reasons, the argument by plaintiffs' *amici* that mobile contracting should be subject to a heightened notice standard (Pub. Justice Br. 24-27) is completely unpersuasive.

any contract.'" *Perry*, 482 U.S. at 489 (quoting 9 U.S.C. § 2). "By enacting § 2, . . . Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" *Casarotto*, 517 U.S. at 687 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). In other words, as the Supreme Court has reiterated time and time again, Section 2 of the FAA preempts state-law rules that are "restricted to [the] field" of arbitration and do not "place arbitration contracts on equal footing with all other contracts." *Imburgia*, 136 S. Ct. at 468-69 (quotation marks omitted).[7]

Appellants' view runs afoul of these well-settled principles in numerous respects. To begin with, appellants' argument that a higher burden of notice ("clear and conspicuous") should apply to contracts with arbitration provisions necessarily rests on "the tired assertion that arbitration should be disparaged as second-class adjudication." *Carbajal v. H&R Block Tax Servs., Inc.*, 372 F.3d 903, 906 (7th Cir. 2004). As the Supreme Court ex-

---

[7]    *See also, e.g.*, *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1204 (2012) (per curiam); *Concepcion*, 563 U.S. at 339; *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67-68 (2010); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009); *Preston v. Ferrer*, 552 U.S. 346, 356 (2008); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270-71 (1995*); Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 474 (1989); *Perry*, 482 U.S. at 492 n.9; *Southland Corp. v. Keating*, 465 U.S. 1, 10-11 & 16 n.11 (1984).

plained three decades ago, "we are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985).

The mistrust of the arbitral process reflected in appellants' view of the enforceability of arbitration agreements long "has been undermined by" the Supreme Court's "arbitration decisions." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 34 n.5 (1991); *see also, e.g.*, *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 266 (2009); *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 231-32 (1987).

Moreover, appellants' attack on the waiver of a jury trial (Op. Br. 47) is, not coincidentally, an attack on a defining characteristic of arbitration. *See, e.g.*, *Concepcion*, 563 U.S. at 342.  That is why it is "well-settled that waivers of jury trial are fully enforceable under the FAA." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 126 (2d Cir. 2010).  Appellants' rule that contracts with waivers of jury trials should be viewed more harshly is plainly a contract defense that specifically targets arbitration agreements and is accordingly preempted by the FAA.

Nor are appellants correct to contend that the district court *lowered* the burden for proving contract-formation in cases involving arbitration

provisions.  On the contrary, appellants would have this Court impose a *higher* burden on such contracts:  despite acknowledging that the arbitration provision itself was clearly marked under a bolded heading marked "dispute resolution," they nonetheless argue that the placement of the arbitration clause several pages into Uber's Terms rendered the term inconspicuous.  Op Br. 36.

That is precisely the kind of heightened notice provision for arbitration agreements that the Supreme Court held unlawful in *Casarotto*. There, the Montana Supreme Court refused to enforce an arbitration agreement in reliance on a Montana statute that required contracts containing arbitration clauses to declare that fact in "underlined capital letters on the first page of the contract."  517 U.S. at 683 (quotation marks omitted).  That requirement, the Court held, "directly conflict[ed] with § 2 of the FAA because the State's law conditions the enforceability of arbitration agreements on compliance with a *special notice requirement not applicable to contracts generally.*"  *Id.* at 687 (emphasis added).  In other words, a rule "'requiring *greater information or choice* in the making of agreements to arbitrate than in other contracts is preempted.'"  *Id.* (emphasis added) (quoting 2 Ian R. Macneil *et al.*, Federal Arbitration Law § 19.1.1, pp. 19:4-19:5 (1995)).

In short, appellants would have this Court treat arbitration clauses as a disfavored term and apply every presumption against the enforceability of arbitration agreements—creating a higher standard for the formation of contracts that contain arbitration clauses than for contracts that do not. The FAA, and decades of Supreme Court precedent interpreting the statute, forbid that result.

## CONCLUSION

The district court's judgment should be affirmed.

Dated: April 24, 2017

Respectfully submitted.

*Of Counsel:*

Kate Comerford Todd
Warren Postman
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

s/ Andrew J. Pincus
Andrew J. Pincus
Archis A. Parasharami
Karianne M. Jones*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000

*Attorneys for* Amicus Curiae *the Chamber of Commerce of the United States of America*

*Admitted in the state of Minnesota. Practicing under the supervision of firm principals.

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i)    complies with the type-volume limitations of Rule 29(5) and Rule 32(a)(7)(B) because it contains 4,434 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

s/ Andrew J. Pincus
Andrew J. Pincus

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of April, 2017, I electronically filed the foregoing with the Clerk of the Court using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users, who will be served by the appellate CM/ECF system.


s/ Andrew J. Pincus
Andrew J. Pincus